## A10A1253. MOSERA v. DAVIS et al.

(701 SE2d 864)

MIKELL, Judge.

Dan Mosera appeals from the order of the Superior Court of Fulton County granting summary judgment in favor of attorneys Michael P. Davis and R. Milton Crouch, and their law firm, Shapiro Fussell Wedge & Martin, LLP (hereinafter "appellees"), in this action for legal malpractice and breach of fiduciary duty. For the following reasons, we affirm.

> To prevail on summary judgment, the moving party must show that no genuine issues of material fact remain to be tried and that the undisputed facts, viewed in the light most favorable to the nonmovant, warrant judgment as a matter of law. On summary judgment, we must construe the evidence and all reasonable inferences and conclusions that may be drawn from it most favorably to the nonmovant.[1]

So viewed, the evidence shows that in 1998, Mosera formed a software distribution business in California with two partners. Represented by Atlanta attorney Wade Anderson, the business asserted legal claims against a software manufacturer, which claims were eventually settled in 2002. Mosera, who had moved to Atlanta in the meantime, received approximately $560,000 from the settlement. In January 2002, attorney Anderson approached Mosera about an investment opportunity involving Humberto Bethencourt, with whom Mosera had done business upon first arriving in Atlanta. Anderson advised Mosera that he had a client who had won land in a quiet title suit; that the client wanted to develop a subdivision; and that Bethencourt was going to be the developer.

Using the money from the settlement, Mosera loaned $500,000 to TBG Group, Inc. ("TBG"), a Bethencourt-related entity, which was the manager of a joint venture, Rowland Springs, LLC ("Rowland Springs"), for the development of a subdivision in Bartow County. On February 8, 2002, Mosera executed a loan agreement with TBG, which gave him a deed to secure debt on the subdivision. Bethencourt executed the loan agreement as president of TBG. According to the loan agreement, Mosera was to receive interest payments of $3,800 per month for 18 consecutive months, until August 29, 2003, when a balloon payment for the principal amount was due. The loan agreement also specifically provided that Ander-

---

[1] (Punctuation and footnote omitted.) *Cleveland Campers v. R. Thad McCormack, P.C.,* 280 Ga. App. 900 (2) (635 SE2d 274) (2006).

son represented Rowland Springs. The interest payments were made, but the balloon payment was not. When Mosera threatened to foreclose on the property, Anderson told him that he could not because his deed to secure debt had never been filed.[2] After the loan default, Mosera was referred to appellees.

On October 24, 2003, attorney Davis wrote a letter to Mosera explaining Georgia's recording statutes and the consequences of Anderson's failure to file the deed to secure debt. Mosera testified that "90 percent of it [was] legalese, which you know, I got the gist of it." The letter explained that an unfiled deed to secure debt could be enforced against the party to the instrument, or against a transferee that had constructive notice of the instrument, but not against a bona fide purchaser.

On December 23, 2003, Mosera filed suit in Fulton County Superior Court against TBG, Rowland Springs, Bartow Group, Bethencourt, and Anderson ("defendants"), asserting claims for fraud, breach of contract, promissory estoppel, conspiracy, and theft by deception (the "underlying litigation"). The complaint alleged that Anderson and Bethencourt are officers, members, principals, or partners in TBG, Rowland Springs, and Bartow Group; that TBG had no ownership interest in the property at the time the loan agreement was executed; that Bartow Group was the true owner of the property; and that defendants made numerous transfers or conveyances of the property in an effort to confuse buyers and lenders as to its true owner. On January 7, 2004, Davis filed on Mosera's behalf a notice of lis pendens against the property relating to the underlying litigation.

Prior to and subsequent to the filing of the complaint in the underlying litigation, Mosera attempted to settle the matter with Anderson and Bethencourt. The record reflects that on February 27, 2004, Mosera approved the following counteroffer to defendants (excluding Anderson):

> (1) The down payment of approximately $172,000.00 is acceptable[;] (2) Along with the properly executed Security Deed, I will need written certification from you that the title to the property remains in the name of Bartow Group, the

---

[2] Mosera learned that TBG had never owned the property referenced in the February 8, 2002, deed to secure debt; the property was owned by Rowland Springs, which had received it via a quitclaim deed less than a month before execution of the loan agreement. By the end of 2002, Rowland Springs had transferred the property via quitclaim deed to The Bartow Group, LLC ("Bartow Group"). On January 3, 2003, Bartow Group borrowed $500,000 from Cherokee Bank, which recorded a deed to secure debt and security agreement. Six months later, Cherokee Bank gave Bartow Group a development loan in the amount of $1,650,000 and recorded its security interest.

entity which will be granting Mr. Mosera the Security Deed[;] (3) Dan Mosera to receive $15,000.00 from the first 50 closings which occur from the subdivision, for a total of $750,000.00[;] (4) [Defendants] will execute a Consent Judgment in favor of Mr. Mosera which will not be filed with the Court unless, following written notice and an opportunity to cure, your clients default on the terms of the settlement[;] (5) Mr. Mosera will release the Lis Pendens immediately upon payment of the $172,000.00 in down payment and the transfer of the Security Deed[;] (6) Upon execution of a Settlement Agreement, Mr. Mosera will dismiss the lawsuit without prejudice[;] (7) Mr. Mosera would credit your clients any funds which he might recover from Wade Anderson through this lawsuit or the Mosera Promissory Note.

No settlement was reached at that time, however, because Bethencourt insisted that the lis pendens be released prior to any settlement, so that he could refinance the property; and Mosera would not agree to such a release.

Sometime in April 2004, attorney Crouch became involved in the settlement negotiations; and on May 24, the parties reached a final agreement (the "Settlement Agreement") similar to Mosera's counteroffer. The Settlement Agreement provided as follows: (1) a settlement amount of $857,500; (2) an initial payment of $150,000; (3) execution of a Promissory Note and a second priority deed to secure debt, with the property (the land used to develop the Rowland Springs development) pledged as collateral, and Mosera's promise to file the deed to secure debt only upon breach of the Settlement Agreement and failure to cure;[3] (4) $15,000 payment per lot closing until payment of all principal of $707,500, plus interest of 2% per month on the unpaid balance; (5) release of the lis pendens upon payment of the proceeds of the sale of two of the three condominiums; (6) dismissal of the lawsuit; and (7) a consent judgment reflecting the settlement terms, to be filed in the event of an uncured default by defendants.

According to Mosera, Crouch and Davis advised him that under the Settlement Agreement, he was "100 percent secured in second position behind Cherokee Bank." Mosera read the terms of Cherokee

---

[3] According to appellee Davis, defendants insisted that the Deed to Secure Debt not be filed unless and until a default occurred, because the bank holding the construction loan was concerned about the project and under the terms of that construction loan, the filing by another party of a deed to secure debt on the property would cause an automatic default. Davis deposed that the filing of a deed to secure debt was a "deal breaker" for Bethencourt.

Bank's deed to secure debt and acknowledged that the filing of another deed to secure debt on the property would have resulted in a default under the terms of that document. At the time Mosera entered into the Settlement Agreement with defendants, he understood that the deed to secure debt would not be filed. Although Mosera objected to not filing the deed to secure debt because of his earlier bad experience with the deed to secure debt from TBG, he nonetheless signed the Settlement Agreement. Prior to execution of the Settlement Agreement, Davis also explained to Mosera the purpose of the consent judgment and how it would work in the event of a default. Davis testified that Mosera was advised of all the factors that went into the Settlement Agreement; that Mosera understood that there was some risk involved; that he understood that this was the best deal that appellees could obtain for him; and that he was anxious to get paid for the three condominiums.

Through August 2005, Mosera received $135,000 from nine lot closings and $154,450 in interest payments. Defendants then defaulted on the remaining amount owed. Several months later, Mosera learned that his unrecorded deed to secure debt was ineffective. Mosera contacted Crouch. Crouch sent a notice of default to Bethencourt on February 21, 2006, and filed Mosera's deed to secure debt on March 7, 2006. By that time, however, the real estate involved was encumbered by a secured debt to Southern National Bank in the amount of approximately $5,200,000. On March 20, 2006, Mosera e-mailed Crouch, asking that he file the consent judgment "ASAP." Crouch replied, "Will do," but later advised Mosera that the underlying litigation had been dismissed without prejudice; that the law firm Shapiro Fussell Wedge & Martin, LLP, no longer represented Mosera; and that Mosera would have to file the consent judgment himself. In July 2006, Southern National Bank foreclosed on the property and later sold it for $4,500,000. Mosera's security interest in the property was extinguished by other superior liens, and he was unable to recover additional funds from defendants.

Mosera filed this action against appellees on May 27, 2008, alleging that "[a]s a result of the tactical errors and incompetence of [appellees], [he] was required, and is still required, to initiate legal actions to recover the amounts due to him from [defendants], which has not occurred." Mosera's expert, Stephen Berk, averred that appellees breached their standard of care in several ways, including failing "to act competently in the negotiation, drafting, and execution of the Settlement Documents." Berk further averred that the settlement documents contained numerous inconsistencies; that the deed to secure debt was not recorded; and that by canceling the lis

pendens, Mosera "became an unsecured creditor by releasing his interest in the [property]."

Appellees moved for summary judgment. The trial court granted their motion, ruling that there was no evidence that appellees violated the applicable standard of care; that Mosera had read and understood the terms of the Settlement Agreement; that Mosera could not prove proximate cause and damages, because he failed to show that a better settlement offer was obtainable or that a better outcome would have been achieved had the underlying litigation proceeded to trial; that under the judgmental immunity rule, appellees were not liable for the good faith exercise of their judgment in handling or in recommending settlement of the underlying litigation; and that Mosera's claim for breach of fiduciary duty was a mere duplication of his legal malpractice claim. This appeal followed.

1. Mosera has filed a motion to supplement the record with an order granting his motion for new trial in a separate lawsuit filed against Anderson in the Superior Court of Fulton County. Appellees have not opposed the motion. Mosera seeks to supplement the record because appellees' brief twice refers to a "final judgment" in Anderson's favor in that lawsuit. The order was not considered by the trial court in its summary judgment ruling. Generally, this Court will not consider facts that were not before the lower court; however, "[j]udicial cognizance may be taken of public records from other proceedings."[4] Accordingly, to the extent the order is relevant to this appeal, we will consider it. Mosera's motion to supplement the record to include the order granting his motion for new trial is granted.

2. Mosera contends that the trial court erred in granting summary judgment to appellees, arguing that there are genuine issues of material fact as to whether (a) appellees failed to comply with the applicable standard of care; (b) Mosera made an informed decision; (c) appellees' alleged legal malpractice proximately caused his damages; and (d) appellees are protected by judgmental immunity.

> To prevail on a legal malpractice claim, a client must prove that (1) he employed the defendant attorney; (2) the attorney failed to exercise ordinary care, skill, and diligence; and (3) this failure was the proximate cause of damages to the client. To establish proximate cause, the client must

---

[4] (Footnote omitted.) 29 AmJur2d Evidence § 149. See *Rothenberg v. Security Mgmt. Co.*, 667 F2d 958, 961, n. 8 (11th Cir. 1982) (appellate court can take "judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal") (citations omitted).

show that but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture. The defendant attorney is entitled to summary judgment if he shows that there is an absence of proof adduced by the client on the issue of proximate cause.[5]

At the outset, we reject Mosera's claims concerning alleged contradictory terms and poorly drafted sections of the settlement documents. Mosera has not shown how any of the alleged contradictions or incomplete sentences harmed him in any way.[6] Neither of Mosera's experts explained how Mosera was harmed by these alleged errors. Berk merely concluded, without explanation, that appellees were guilty of poor draftsmanship and that they breached the relevant standard of care. Expert Larry McDaniel testified that he had not even been asked to render an opinion on the alleged typographical errors and contradictory language of the settlement documents. Accordingly, we will only consider Mosera's claim that appellees were negligent in allowing him to accept a deed to secure debt that he was not permitted to file.

Mosera contends that this case is controlled by *Redwine v. Windham*,[7] because appellees' negligence caused Mosera to lose all of his leverage and ability to reclaim his agreed-upon collateral. Appellees, on the other hand, contend that *Redwine* does not apply and that this case is controlled by *Hudson v. Windholz*.[8] We agree with appellees. *Redwine* is not controlling in the case before us. In *Redwine*, because the defendant attorney conceded liability for failing to file a UCC-1 financing statement properly,[9] the only issue remaining before the court was the amount of damages. Here, in contrast, appellees have contested liability, contending that they advised Mosera of the risks of not filing the deed to secure debt and that he understood those risks.

That Mosera's claimed damages are similar to those alleged by the plaintiff in *Redwine* does not mandate his entitlement to them, as he must first show that appellees were negligent and that this

---

[5] (Punctuation and footnote omitted.) *Millsaps v. Kaufold*, 288 Ga. App. 44, 44-45 (653 SE2d 344) (2007).

[6] See, e.g., *Bonner Roofing &c. Co. v. Karsman*, 285 Ga. App. 586, 588 (1) (646 SE2d 763) (2007) (clients' expert's conclusion in legal malpractice action that legal description of property in lien was "inadequate merely because it was inadequate" insufficient to prove that lawyer's alleged error proximately caused clients harm). Compare *Millsaps*, supra at 45 (expert affidavit in legal malpractice action explained alleged negligence and how it harmed plaintiff).

[7] 237 Ga. App. 149 (513 SE2d 13) (1999).

[8] 202 Ga. App. 882 (416 SE2d 120) (1992).

[9] *Redwine*, supra at 150.

negligence caused his injury. This he cannot do. Under the Georgia doctrine of judgmental immunity,

> [t]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. If this were permitted, the original trial would become a "play within a play" at the malpractice trial.[10]

Further, "[t]here are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby. This rule has particular force when the party is well educated and laboring under no disabilities. To hold otherwise is to create the potential for malpractice litigation in every contract dispute."[11] With regard to the October 24, 2003, letter from appellees to Mosera, explaining the consequences of failing to file a deed to secure debt, Mosera's expert McDaniel testified that he had no criticism of the legal analysis contained therein and that the letter "accurately describes all with respect to priorities and the filing of deeds to secure debt." He further agreed that the advice given in the letter was the advice that "Mosera should have been given prior to the execution of the settlement documents." In this case, Mosera was a well-educated businessman with a degree in engineering, who had already been burned once before, when attorney Anderson failed to file a deed to secure debt from TBG on Mosera's behalf. Mosera pursued settlement with defendants and knew that they would settle only if he released the lis pendens and agreed to file the deed to secure debt only if they defaulted under the Settlement Agreement. The evidence reflects that appellees advised Mosera of the consequences of failing to file a deed to secure debt; that Mosera understood the risks involved; and that this was the best deal appellees could obtain for him, given defendants' demands and Mosera's desire to settle. In light of this evidence, and in light of the fact that there is no evidence that defendants would have agreed to terms more favorable for Mosera, we conclude that appellees exercised their best, informed judgment given the circumstances. Accord-

---

[10] (Citation and punctuation omitted.) *Hudson*, supra at 886 (3).

[11] (Citation and punctuation omitted.) Id. at 887 (3).

ingly, we affirm the trial court's ruling granting summary judgment to appellees.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED SEPTEMBER 28, 2010.

*Merolla & Gold, Angelo T. Merolla*, for appellant.

*Hawkins, Parnell, Thackston & Young, Kim M. Jackson*, for appellees.